RENDERED: OCTOBER 24, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0012-MR

WILLIAM SLOSS                                               APPELLANT

                   ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                  HONORABLE A.C. MCKAY CHAUVIN, JUDGE
                               NO. 20-CR-000434

COMMONWEALTH OF KENTUCKY                         APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

William Sloss was convicted of murder, abuse of a corpse, and of being a first-degree persistent felony offender and was sentenced to fifty years' imprisonment. In this matter of right appeal, he alleges that although he contumaciously chose to be absent from both phases of his trial and sentencing, his Sixth Amendment right to be present at all critical stages of his trial was violated because the trial court failed to conduct a hearing prescribed by Kentucky Rule of Criminal Procedure (RCr) 8.28(1) and failed to obtain his personal waiver of his right to be present. He further alleges that the trial court erred by failing to grant his motion for a mistrial, by failing to grant his motions for directed verdict, by improperly admitting prior bad acts evidence, and by improperly admitting hearsay statements by the victim into evidence.

In the alternative, he asserts cumulative error occurred. After thorough review, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

The victim in this case, Amanda Berry, grew up in Bell County, Kentucky. Like so many Kentuckians, Amanda struggled with substance use disorder (SUD), and these struggles ostensibly led to her being convicted for writing bad checks.[1] During her incarceration for this offense, she met Sloss through a pen pal program. When Amanda was eventually granted parole, she decided she wanted to leave home to better her chances at maintaining her sobriety. In July 2019, she received permission from her parole officer to change her residence from her mother's home in Bell County to a home in Louisville, Kentucky, owned by Sloss' older brother John Sloss. The home, located at 3211 Virginia Avenue, was a home in the loosest sense of that term: it was in a significant state of disrepair, it had no running water, it had limited electricity, and it was very sparsely furnished. Although John Sloss owned the home it was undisputed that Sloss and Amanda were the only people that lived in it during the time frame at issue herein.

As Amanda and Sloss were essentially destitute, they relied on the kindness of their neighbors for many things, including water. Two of their neighbors testified that they would allow Amanda and Sloss to get water from their houses by filling up large plastic storage totes. Photographic evidence in

---

[1] It is unclear from the record when this conviction occurred and how long Amanda was incarcerated for it.

this case demonstrated that there were numerous such plastic totes in several different rooms of Amanda's and Sloss' home.

At trial, Amanda's and Sloss' neighbors from the 3200 block of Virginia Avenue provided insight into their turbulent relationship. John Bolin and Karen Bolin were siblings who lived immediately next door to Amanda and Sloss at 3213 Virginia Avenue. John Bolin testified that he knew Amanda and Sloss both used drugs, as he had participated in that activity with them. He further stated that Amanda and Sloss argued often and that he could hear those arguments from inside his home. Finally, he testified that at some point after Amanda disappeared, her parole officer had been in the neighborhood looking for her. When John Bolin later saw Sloss walking down the street he asked him where Amanda was. Sloss' response was "I got rid of her," which John Bolin interpreted at the time to mean that he broke up with her.

Karen Bolin similarly testified that Amanda and Sloss fought often and, due to the proximity of her home to theirs, she would frequently hear those arguments. Although Karen never saw physical violence between them, she did see the aftermath, including bruises on Amanda's wrists, ankles, neck, and face. When Amanda and Sloss first moved in, Sloss had a job and Karen saw no indication that either of them were using drugs. But over time it became apparent to her that they were and eventually Sloss stopped working. They then started making money through Amanda's involvement in sex work. Karen said that at first Amanda and Sloss argued over her involvement in sex work because Sloss was making Amanda do it against her will. But, over time Sloss

3

"started to not become okay with it" and they began fighting about that. She also testified that sometimes after they fought, Sloss would kick Amanda out or she would leave and be gone for days or weeks, but she would always come back. However, sometime around the middle of January 2020, Karen was woken up at 3 a.m. to the sound of Amanda and Sloss having an argument outside that was "louder" than the arguments they usually had. During that argument Karen heard the backdoor of their house slam and did not hear anything else after that. She never saw Amanda again.

Mary Sparks and Dwayne Crutcher were a couple that lived at 3247 Virginia Avenue on the opposite end of the street from Amanda and Sloss' home. Their home was across the street from a corner store that Amanda frequented. At some point Mary began speaking to Amanda when she saw her and over time, they became "best friends." She too testified that Amanda and Sloss argued constantly, and further stated that Amanda would use her home as a kind of refuge from the chaos of the relationship. Mary never witnessed physical violence, but Amanda told her that Sloss beat her, and Mary saw the aftereffects. Mary had seen Amanda with black eyes, a busted nose, and a busted lip. She further described a particular incident during which Amanda and Sloss had gone out somewhere and had gotten in an argument on the way home. Amanda came to Mary's house afterwards and had mud all down the front of her clothes, her shirt was ripped, her mouth was bleeding, her makeup was smeared, she was crying, and it looked like Sloss had ripped portions of her hair out. Finally, Mary testified that the last time she saw Amanda she

4

was talking about leaving Sloss and getting permission from her parole officer to change her residence "because things were getting progressively worse with her and [Sloss], they were arguing all the time, and he had hit her so many times."

Like the other neighbors, Dewayne testified that Amanda and Sloss argued constantly, and that she was always doing something that Sloss did not like or not doing something that he wanted her to do. But, unlike the other neighbors, Dewayne saw Sloss be violent towards Amanda. On an unspecified date, Amanda had come over to his house and her mouth was bleeding. Dwayne, Mary, and Amanda were sitting in the sunroom at the back of the house when Sloss came in the front door and walked through three rooms to get to the sunroom. Dwayne told Sloss he could not just walk through his house uninvited and made him leave. Amanda followed Sloss out, and when they reached the bottom of the front steps Sloss "wailed on her, knocked her off her feet." Prior to that Dwayne had seen Sloss grab Amanda forcefully by the arm to make her leave his and Mary's home. He had also seen injuries on her neck and arms and had seen her with a busted lip and a busted eye. After Amanda disappeared, when Dwayne asked Sloss what happened to her Sloss told him, "She went back home to Bell County."

Amanda's mother, Teresa Berry, testified that after Amanda moved to Louisville to live with Sloss in mid-July 2019, she would go home to visit her three children and Teresa every two to two and a half weeks and would stay anywhere between three days to a week and a half before returning to

5

Louisville. As neither Amanda nor Sloss had a vehicle, Teresa would pick Amanda up at a bus station in London, Kentucky for these visits. The last time Amanda went home was sometime in early November 2019. While Amanda was in Louisville, she and Teresa consistently communicated three to four times a week through a mixture of Facebook Messenger messages and phone calls. Teresa testified that Amanda did not own a phone and therefore had to borrow Sloss' phone or his iPad for these communications.

The last time Teresa spoke to Amanda on the phone was either December 19, 2019, or December 28, 2019.[2] And, by early 2020, Teresa had become extremely concerned about Amanda. Amanda had completely stopped talking to Teresa on the phone and Teresa did not believe that the messages she was receiving from Amanda's Facebook account were from Amanda due to the language utilized. On January 11, 2020, Teresa received a message "out of the blue" from Amanda's Facebook account stating that she was okay and that she was "on the run." When Teresa expressed concern in response to this message, she received the response, "F*ck you, don't worry about me," which, according to Teresa, was not the way Amanda talked.

On the same day, January 11, 2020, Sloss texted Teresa and accused her of prank calling his phone, which she denied. Teresa then told Sloss that she had spoken to Amanda earlier (presumably on Facebook) and had asked

---

[2] At trial, Teresa testified that December 19 was a date that "stuck out in her mind" as the last day she heard Amanda's voice, but closer in time to Amanda's disappearance she told law enforcement that the last time she spoke to her was December 28.

her to call but she had not and asked him where she was. He responded: "I dont no but i did see amanda the other day tho"[3] and "I was with amanda." Teresa responded that Amanda had an appointment that day that she did not show up for and again asked Sloss where she was. He responded: "Ok she can call you I gave her my tablet," "She's not at my house so I dont know," and "[Parole] officer came to my house looking for to I don't know where she at she's around somewhere somewhere I have no clue where she at she won't say where she stay[.]" Teresa asked why the parole officer was looking for her, but Sloss did not respond until two days later.

When Sloss responded on January 13, 2020, he sent the messages, "Have amanda call you" and "She want text me back r call[.]" Teresa responded that she had not talked to her and told Sloss to ask Amanda to call her. Sloss responded with the messages, "Ok i will try" and "Have she done this bfor" to which Teresa responded she had not. Sloss then sent: "Ok amanda is crazy for doing this[.]" When Teresa asked what he meant he responded, "Whatever she is doing" and "We don't talk no more." Teresa sent something in response that was redacted from the record, to which Sloss replied, "I dont care where she is at we not together[,]" "Yea i put her ass out[,]" and "My brother was there when i put amanda out[.]" Teresa asked when that happened, and he did not respond. Six days later on January 19, 2020, Teresa again asked if Sloss had seen or heard from Amanda, but he never responded.

---

[3] We provide the messages from Sloss to Teresa in their original form, including grammatical and spelling errors.

In the interim, on January 13, 2020, Teresa had filed a missing person report for Amanda with the Louisville Metro Police Department (LMPD) over the phone, but she heard nothing from LMPD for over two weeks thereafter. Consequently, Teresa called LMPD again on January 29, 2020, and spoke to Bill Clark, an LMPD missing persons detective. Immediately after speaking to Teresa, Det. Clark went to the home that Sloss and Amanda had been living in and knocked on the door, but no one answered. On the same day, January 29, Det. Clark obtained a search warrant for the home. Prior to executing the warrant, Det. Clark contacted John Sloss, as he was the owner, and asked him to let law enforcement into the home in lieu of having to "break down the door." John Sloss agreed to let the officers in but, because he lived in Elizabethtown, Kentucky, he could not get there right away. John Sloss therefore had his younger sister Rachel Sloss meet the officers at the home while he was en route; Rachel lived around the corner from Virginia Avenue. She let the officers in, and John Sloss arrived in Louisville sometime thereafter. Neither John Sloss nor Rachel were allowed in the home during the execution of the warrant.

The search warrant was executed sometime around 6-6:30 p.m. on January 29. Det. Clark was accompanied by two other detectives as well as crime scene unit (CSU) technicians who took photographs of the exterior and first floor of the home. Those photographs depicted that, although no one was present when the officers responded, there were a few lights and a number of space heaters on throughout the home. No photographs were taken of the basement or the attic at that time. The detectives observed no signs of foul

8

play and, although the three of them searched the basement together, they found nothing. The search took about an hour to complete, meaning that the officers left the premises sometime around 7-7:30 p.m.

About three hours later at 10:10 p.m. John Sloss called Rachel, who had returned home after letting the police in, and asked her to come back to the house. Rachel would later tell law enforcement that when John Sloss asked her to come back over, he told her he "might know something about a body," although she was reluctant to admit the same at trial. Rachel testified that when she entered the first floor of the home it smelled "like Pine Sol and bleach."[4] Rachel followed John Sloss into the basement of the home. Rachel testified, again reluctantly, that John Sloss was on the phone with Sloss while they were in the basement and that Sloss did not know Rachel was there. Rachel could hear Sloss on the other end of the line yelling at John Sloss that he was not looking in the right spot in the basement. John Sloss then began telling Rachel to move items around at which point she left to sit in John Sloss' car outside; she testified that she did not want to touch anything in the basement because she did not want her fingerprints on anything down there.

After Rachel left him in the basement, John Sloss texted John Bolin and asked him to do him a favor. As previously mentioned, John Bolin was the next door neighbor but, prior to that night, John Bolin had only spoken to

---

[4] A spray bottle of "Spic and Span" cleaner was observed on the hearth of the fireplace in the front room of the home, and a spray bottle of "Value Cleaner with Bleach" was found on a table in a different room.

John Sloss a few times in passing. John Sloss told John Bolin that a search warrant had been executed at the home earlier that day and he wanted to go in and look around to make sure "nothing funny" was going on. John Bolin testified that when he met John Sloss at the house he did not look around and instead went directly to the basement. He further testified that it was very dark in the basement and that he had no light source, but John Sloss was using the light on his phone to look around.

Before proceeding with discussion of what occurred, a brief description of the basement is needed. The stairs that descended into the basement ended in an open and empty space. Indeed, the entire basement was empty save for one small alcove in the far corner diagonal to the stairs. The alcove was about six feet long and four feet wide and was filled side to side, front to back, and approximately knee to hip height with various items: trash bags, scrap wood, a door, some aluminum ducts, clothing, an empty plastic storage tote, etc. John Sloss led John Bolin to that alcove and told him to start looking around. While near the back wall of the alcove, John Bolin lifted a trash bag off a blanket and then lifted the blanket. He asked John Sloss what was under it at which point John Sloss looked over John Bolin's shoulder, briefly shined the light on something, and then told John Bolin, "Okay, let's go." The two then immediately left the house.

What John Bolin did not know at that time was that he had found Amanda's body. She was naked and had been stuffed face down in the fetal

position into a 35" x 21" x 18" plastic storage tote.[5]  The tote did not have a lid

on it and had instead been covered with a blanket and other items.  The

medical examiner that performed Amanda's autopsy testified that her body

showed signs of moderate decompositional changes including discoloration of

the skin, slippage of the skin and hair, and a significant amount of mold

growth.  Based on these changes, the medical examiner concluded that

Amanda had been dead for "weeks," but could not provide an exact date or

time frame.  He noted that a cold environment, such as an unheated basement

in winter, could slow the process of decomposition.  He determined that

Amanda's cause of death was multiple traumatic injuries sustained in an

assault including manual strangulation and blunt force injuries to the head.

She had defensive wounds on her forearms.  Amanda's toxicology report

showed the presence of amphetamine, a metabolite of methamphetamine, in

her blood.  The medical examiner classified the amount present as an

intoxicating level, but there was no indication that it was enough to cause an

overdose.

John Bolin was also not aware that John Sloss had been recording a

video of him the entire time they were in the basement.  Sometime soon after

they left the basement, John Sloss recorded three portions of that video on

another recording device and deleted the original video.  In other words, John

Sloss took three recordings of a recording, none of which had audio.  The first

[5] Amanda was 5'1" and weighed 147 pounds.

11

clip did not show anything pertinent. The second clip showed John Bolin standing in the alcove of the basement and lifting a black trash bag off items below it. The third clip showed Amanda's body in the plastic tote very briefly, and then demonstrated that John Sloss immediately began walking towards the basement stairs.

After John Bolin and John Sloss left the basement, John Bolin returned home. Shortly thereafter at 11:09 p.m. John Sloss called Jody Speaks, an LMPD homicide detective. John Sloss told Det. Speaks that he had seen a deceased female's body in a decomposed state but would not initially tell him who or where the body was. John Sloss wanted Det. Speaks to expunge his criminal record and help him get some vehicles out of impound in exchange for that information. After Det. Speaks explained that he did not have the authority to do either of those things, John Sloss agreed to meet with him in person. Det. Speaks and Detective Timothy O'Daniel picked John Sloss up "in the area" of Virginia Avenue and drove around the neighborhood with him in the backseat.

During the detectives' conversation with John Sloss in Det. Speaks' vehicle, he again tried to exchange the information he had for expungement and help with his impounded cars, which the detectives again explained they could not do. John Sloss was still not immediately forthcoming with information about Amanda's body; at first he told them that her body was in the woods, and then he told them that her body was in a different house in the neighborhood. After about twenty minutes he admitted that her body was in

12

the house he owned and showed the detectives the video clips he had recorded of the video of John Bolin in the basement. Based on John Sloss' statements and the video clips the detectives obtained a second search warrant for the house and executed it during the early morning hours of January 30, 2020. During the execution of the warrant, John Sloss took the detectives directly to Amanda's body.

After Amanda's body was found, John Sloss was cooperative and participated in several different interviews with the police, but he gave them multiple, varying stories about how he knew where Amanda's body was, who killed Amanda, and what Sloss told him had happened to Amanda.[6] Regarding how he knew where Amanda's body was, he told the police at different times that "a dude down the street" called him and told him where she was; that "the guy next door" told him where the body was; and that some unknown person called him from a blocked number and told him where it was. He also gave varying accounts of who killed Amanda: he told police that "Wayne[7] and Amanda got into it, and he killed her"; that "a guy next door and a black guy" killed her; and that he did not know who killed her. Finally, as to what Sloss said had happened to Amanda, John Sloss told the police that Sloss told him that Amanda had "run off with some dude"; that "she went back home"; that "[Sloss] had sent her back home"; that "they were high on some sh*t and an

---

[6] The dates of these statements and when they occurred within a particular interview was not clarified at trial.

[7] It is not clear who "Wayne" was, but it was clarified at trial that John Sloss was not referring to Dwayne Crutcher.

13

overdose happened"; that they were at a party, got high, got into a fight, Sloss left, and when he came back she was gone; and that they were at a party, Sloss left, and when he came back Amanda wasn't moving.

Sloss also told Rachel several different stories about what happened to Amanda that Rachel later recounted to law enforcement. Sloss had told her that Amanda went back home, that he did not want to be with her anymore, that she had been getting on his nerves for months, that he got rid of her and sent her back home, that he gave her money and put her on a Greyhound bus, and that she had run off with "some dude."

Amanda's body and the plastic tote she was found in were both swabbed and tested for DNA against buccal swabs taken from Sloss, John Sloss, and John Bolin. None of the partial DNA profiles that were found were sufficient for comparison and only Amanda's DNA was definitively present.

The defense asserted three arguments to the jury. First, it highlighted that the Commonwealth had presented no direct evidence—DNA, eyewitness testimony, etc.—that Sloss killed Amanda and contended that just because Sloss abused Amanda did not mean he murdered her. Moreover, even though a data extraction was performed on John Sloss' phone, the Commonwealth presented no evidence of whom he spoke to around the time that he and Rachel went into the basement together on the night Amanda's body was found. Second, although at least one witness told law enforcement that Amanda was engaged in sex work and several witnesses told them that she

used drugs, the lead detective in the case never investigated the possibility that Amanda had been murdered by one of her clients or one of her dealers.

Finally, the defense presented a kind of quasi aaltperp defense. While the defense did not assert that John Sloss killed Amanda, Sloss argued that John Sloss had something to do with placing her body in the basement after the first search warrant had been executed on January 29. Sloss contended that it was not possible that Amanda's body was in the house during the execution of the first warrant because three experienced detectives searched the basement and did not find her. Sloss asserted that John Sloss placed Amanda's body in the basement after the police left the premises. He asserted that this was critical because Sloss did not have a vehicle and had no way of transporting Amanda's body. The defense also implied that John Sloss had originally tried to frame Rachel and, when that did not work, John Sloss tried to frame John Bolin. Sloss contended that was why John Sloss had recorded John Bolin in the basement and showed that video to the detectives. The defense believed John Sloss was attempting to divert law enforcements' attention away from himself rather than away from Sloss.

After hearing the foregoing evidence, the jury deliberated for two hours before finding Sloss guilty of murder, abuse of a corpse, and of being a first-degree persistent felony offender (PFO 1st). The jury recommended a sentence of thirty-five years for murder and five years for abuse of a corpse which was enhanced to fifteen years due to his PFO 1st status. The jury recommended these sentences run consecutively for a total of fifty years.

15

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. Sloss waived his constitutional right to be present during the guilt and penalty phases of his trial and sentencing.

Sloss contends that his right to be present at every critical stage of the proceedings against him was violated even though he willfully refused to attend both phases of his trial and sentencing after being advised numerous times by both the court and his counsel of his right to be present and the potentially disastrous consequences of failing to be present. As the circumstances that led to his absence are crucial to our analysis, we begin there.

Sloss' disruptive behavior and unwillingness to participate in his own defense began long before his trial. At the time of his arraignment in August 2020, Sloss was represented by appointed counsel Sheila Seadler. By February 2021, Sloss began filing several *pro se* motions expressing dissatisfaction with Seadler and requesting her removal.[8] In response to these motions, Seadler filed a motion for an *ex parte* hearing regarding her status.

During that *ex parte* hearing, held in May 2021, the trial court explained to Sloss that it took his concerns seriously but emphasized that he had been appointed highly competent counsel. The trial court asked Sloss what his specific grievances against Seadler were, to which he responded, "I don't know." After being asked again if he had any specific concerns about his counsel that

---

[8] We note that these *pro se* motions were filed after Sloss had been told by the trial court numerous times not to file *pro se* motions, as they could be used against him at trial to his detriment.

he wanted the court to address he said, "No." The trial court noted that it seemed as though Sloss was attempting to make his attorney's job harder, which was not in his best interest as her job was to help him. Sloss responded that he had been locked up all his life and that it could not get any worse. The trial court tried to reason with Sloss and told him that it could get worse and that if he failed to assist counsel in his defense it almost surely would get worse. The trial court told Sloss it wanted him to have a fair trial and wanted him to help himself in that endeavor. Sloss simply responded, "Okay."

At a subsequent pre-trial hearing in June 2021, the trial court again addressed Sloss directly concerning his seeming unwillingness to work with Seadler. The court emphasized that Sloss had been appointed an excellent lawyer that was working hard on his behalf and that if he did not work with her it could end up "disastrously" for him. Sloss responded by repeatedly saying, "I don't care." The court told him that he should care and that for someone to say that they do not care if they spend the rest of their life in prison is abnormal. Sloss continued to say that he did not care. The trial court then advised him that if his behavior thus far was an effort to create a reversible issue on appeal, the court had seen other defendants attempt to do the same thing and it was a "terrible strategy." The trial court again implored him to work with his attorney to help himself. Seadler then began talking about having Sloss measured for trial clothing and the following exchange occurred:

> **Seadler:** I will anticipate being before the court for something. I know that when it comes to it I will ask the court to allow me to measure William because he doesn't know what size he is and it—

17

**Sloss:** It doesn't matter I'm not coming back in this courtroom. I'm going to refuse to come. I'm just letting you know I'm not coming back in here. Never. Going to have to make me come.

**Court:** Mr. Sloss, yeah, I can. But why would you want me to do that?

**Sloss:** Nah, I'm just saying you're going to have to make me come. I'm not going. I'll refuse to come back in here I don't care what court date is it. I'm not coming. You gotta make me come.

**Court:** Alright, so I know I talk to you casually and I try to be nice, but in the end, I'm going to control this courtroom.

**Sloss:** I don't care. What are you going to do? Take me to court? I don't care. I'm ready to get out of here.

[Sloss then stands up and walks out of the courtroom while saying something inaudible]

**Court:** (Reluctantly) That's contempt. Thirty days off your good time.

After Sloss was out of the courtroom, the court noted that he believed Sloss' behavior to that point was a choice and perhaps the result of a personality disorder. But, out of an abundance of caution, the court *sua sponte* ordered Sloss to be evaluated for competency to stand trial at KCPC[9]. Although Sloss later filed a letter stating he would refuse to go to KCPC and would refuse to be evaluated, he was ultimately transported to KCPC, evaluated, and found to be competent.

In July 2021, Sloss signed, dated, and filed a piece of paper into the record that contained explicit threats to both the trial court and Seadler. It said:

---

[9] Kentucky Correctional Psychiatric Center.

18

> To: Chauvin I have someone cut you head off and place it in a pot and turn on the stove when your head gets done cooking I would like to be there to feed it to your family b*tch
>
> To: Seadler I hope you fell over dead inside the court room bitch next time I'm gonna spit in your face you will get the f*ck off my case

In response to this, and continued *pro se* motions to remove Seadler, the trial court removed Seadler from Sloss' case and appointed Mac Adams, who represented him throughout trial and sentencing. The order removing Seadler found that she acted with "the highest degree of competence" in representing Sloss, but Sloss' inexplicable level of hostility against her compelled the court to remove her.

On August 12, 2021, Sloss filed yet another *pro se* motion that was styled: "Motion to waive all my rights voluntarily to a trial." Several months later, on Wednesday, October 12, 2022, the court and the parties held a final status conference in anticipation of Sloss' trial which was set to begin the following Monday. During the status conference Sloss remained in the holdover and the court noted he had "opted not to join them." The court stated it was okay with that for the day but would "obviously not be okay with that on Monday."

On the following Monday (October 17) at 10:28 a.m., the court and the parties were present in the courtroom, but Sloss was not. The trial court explained that Sloss had again refused to come out of the holdover area and into the courtroom. Defense counsel stated the following regarding the situation:

19

> I did speak with him back there and he has made it clear that he's not going to take part in this, at least right now. . . His refusal to participate, and I will say this, started a little bit last week when we were here and he wouldn't come out but I did not think that it was going, honest to god I didn't think it would carry over. And I spoke to him, he spoke to me in the chatroom, it wasn't like he was refusing that much, but now he won't come out of one of the cells and even go in the chatroom. And I brought him some clothes to dress out and he has refused to participate in that as well. I'm highly reluctant to go in his absentia, I just think that is an awful, galactically bad idea for him.

The trial court agreed that it was a terrible idea for Sloss not to be present but felt that it was his decision not to be. The court stated for the record that Sloss had

> been obstructionist and disrespectful and difficult from the get-go. It's not brand new but this is new and the reason I bring that up is that I don't want to do something to deprive somebody of their due process rights either but if they want to give up their due process rights, my responsibility is bigger than just him and he cannot do this in order to control what happens. That's, to say the least, a bad precedent.

The Commonwealth's position was that if Sloss was choosing not to participate he could be tried in absentia and that they needed resolution in the case. Defense counsel requested some additional time that day to try to reason with Sloss and, if that did not work, requested that the court push the beginning of trial back one day to give counsel another opportunity to speak with him and to allow Sloss "to sleep on it." If Sloss still refused, counsel noted he would have a continuing objection to proceeding without him. The court agreed to meet again at 2 p.m. that day to give defense counsel time to speak with Sloss. When the parties came back at 2 p.m., the trial court stated, "Mr. Sloss has made it clear that he is opting not to be here." Nevertheless, the

20

court agreed to push the first day of trial to the following day to give the defense another opportunity to speak with him.

The following day, October 18, Sloss refused to even be transported from the jail to the courthouse. The trial court stated that "the sheriff's department talked to Mr. Sloss this morning in anticipation of bringing him up to court. He made it very clear to them with what was described to me as very colorful language that he had no intention of being present for the trial." Sloss' defense counsel was obviously very concerned. He informed the court that he had done some research regarding waiver of a criminal defendant's due process rights and believed the circumstances implicated Kentucky Rule of Criminal Procedure (RCr) 8.28. However, he went on to say:

> I think that probably we're past the point of a hearing of any sort as far as his waiver of being here and giving up his right to be here. . . I have spoken to Mr. Sloss every week for the past three weeks. . . He is aware we had trial set yesterday because I told him, and I needed his sizes to dress him out. . . I brought over several things for him to try on, he refused yesterday. He had also said, basically, "What am I even over here for?" and I was like "William you know what we're here for, we're set for trial, you need to come out." It was my advice that he come out and participate but, as I told him, you're a grown human and I'm not going to beg you to do it. I've already begged him as much as I'm going to. But I told him I think his chances of success go down drastically the minute he doesn't come out here. . . I think that under the rule, [RCr] 8.28(1), I think he's waived his due process right to be here at least for what we're going to do today.

The trial court responded:

> I'm familiar with the rule and it talks about a hearing, but it's a hearing for which he's not going to be present and our choices are limited. It's accede to his wishes or drag him up here. I can't imagine the consequences of that if we have him strapped to a chair in front of the jury[.]

Defense counsel agreed that he did not want to do that. The court noted that it thought Sloss' previous refusal to attend the final status conference would be a one-off decision on Sloss' part and therefore did not push the issue at that time. The court noted that "in retrospect" it maybe should have had a conversation with Sloss directly, but it was not inclined "to go visit him at the jail or bring him up here for that purpose" as the court believed Sloss had "ample opportunity to make a choice about whether or not to be here[.]" Defense counsel never requested that the trial court go to the jail to speak to Sloss in person to confirm his decision, never requested that Sloss appear by video to confirm his decision, and never requested that the court have Sloss confirm his decision in writing.

The trial court then made findings regarding Sloss' waiver of his right to be present and why the court was deciding to move forward with the trial in his absence:

> I don't know what anybody else could have done differently to allow him any better opportunity to participate fully. I think this is Mr. Sloss being Mr. Sloss, he's trying to build into this record issues that will be reviewed on appeal. And so, I'm talking directly to the court of appeals: certainly counsel has done everything he can, corrections, the sheriff department, the court, to make sure Mr. Sloss understands the consequences of his failure to appear at his trial. And, to the extent that he is setting this up, in his mind, for some kind of inquiry into his stability, again, the record reflects this is just how he is. It's not a mental disorder, it's his personality in my experience and I don't see any basis for giving him the opportunity to either continue this case unnecessarily or to build in that type of issue unnecessarily. I'm at a loss for options here. We either let him control how this goes or we move forward and if those are the two choices we're going to move forward.

22

The trial began that day in defendant's absence, and the Commonwealth presented its body of proof until the evening of October 20. At that time, the court and defense counsel agreed that Sloss needed to be brought to the courthouse the following morning so that he could decide whether he wanted to testify on his own behalf during the defense's case in chief.

The following morning, Sloss was transported to the courthouse and defense counsel informed the court that he and Sloss had discussed the trial thus far as well as Sloss' right to be present. Sloss indicated to defense counsel that he "was not interested" in testifying in his own defense and that he "was not interested in coming out." Defense counsel noted he would speak to Sloss again after the verdict to see if he wanted to be present for the penalty phase. The court agreed Sloss had a continuing right to be present and that informing him of that right was all they could do on his behalf. We note here that the trial court provided a jury instruction that read, "Mr. Sloss is not compelled to testify or be present in person at the trial, and the fact that he did not and he was not cannot be used as an inference of his guilt and shall not prejudice him in any way." This instruction was in the written jury instructions and was read aloud to the jury by the court prior to closing arguments.

Later the same day, the jury returned its guilty verdicts against Sloss. Sloss had been returned to the jail after speaking with counsel that morning, and defense counsel stated that he needed to be brought back prior to the penalty phase. The trial court agreed, but noted there would be some delay in

getting Sloss back to the courthouse because the jail was in the middle of a shift change. The court did not anticipate that Sloss' stance would change, but the court wanted to give him the opportunity to testify out of an abundance of caution. However, because the jury was waiting to proceed, the court allowed the Commonwealth to proceed with its penalty phase proof at that time. Defense counsel objected to proceeding with the penalty phase without Sloss. The trial court agreed that Sloss had a right to be present but again stated for the record that Sloss had waived that right.

After the Commonwealth completed its proof for the penalty phase, the court ordered a brief recess outside the presence of the jury. Sloss had been transported to the courthouse and defense counsel was able to speak to him. Defense counsel stated:

> Judge I spoke with my client Mr. Sloss and he has informed me that he is not interested, that he is still going to waive his appearance, that he's not interested in coming out and participating in [the penalty phase]. I did inform him he has an absolute right to do so, but, as he told me, "I haven't been out there yet, why would I go back out there now?"

The penalty phase instructions provided the same admonition concerning Sloss' absence that was included in the guilt phase instructions *supra*. After the jury made its sentencing recommendations, Sloss' final sentencing hearing was scheduled for December 13, 2022.

For whatever reason, the parties were unable to locate the video record of Sloss' sentencing. But they have filed an agreed upon "narrative statement" as to what occurred at sentencing. In relevant part, that narrative statement provides:

24

3. The Court advised the parties that information from Louisville Metro Corrections had been relayed to the assigned courtroom sheriff that Defendant Sloss had once again refused to come to court.

4. The Court and the parties took notice of Defendant Sloss' previous refusals to come to court for trial that began October 17, 2022.

5. The Court and the parties took notice of Defendant Sloss' prior use of abusive language towards LMDC staff during his refusals to be brought to court for his trial.

6. Mr. Sloss was never present in the courtroom.

7. No evidentiary hearing with sworn witnesses was held on the issue of whether Mr. Sloss waived his right to be present at the sentencing.

There is no indication from the narrative statement that defense counsel objected to proceeding with sentencing without Sloss.

On appeal to this Court, Sloss asserts two interrelated arguments. He first contends that the trial court failed to hold a hearing pursuant to RCr 8.28(1). He further asserts that the trial court was precluded from finding that he waived his right to be present because it never obtained a personal, verbal waiver of his right to be present.

Sloss' defense counsel lodged a continuing objection to proceeding with the guilt phase of trial in Sloss' absence and objected to conducting the penalty phase of his trial without him. We accordingly consider these arguments to be preserved and will review for harmless error. *See Talbot v. Commonwealth*, 968 S.W.2d 76, 83-84 (Ky. 1998) (citing *Chapman v. California*, 386 U.S. 18 (1967)). Because these alleged errors involve a constitutional right, the test to be

25

applied in the event we hold error occurred is "whether the error was harmless beyond a reasonable doubt." *Talbot*, 968 S.W.2d at 84.

However, there is no indication that Sloss' counsel objected to proceeding with sentencing without him, rendering that alleged error unpreserved. "[A]lleged constitutional errors, if unpreserved, are subject to palpable error review." *Capstraw v. Commonwealth*, 641 S.W.3d 148, 157 (Ky. 2022) (quoting *Walker v. Commonwealth*, 349 S.W.3d 307, 313 (Ky. 2011)). Sloss has requested palpable error review under RCr 10.26 in the event this Court deems any of these issues unpreserved. "Under this rule, an error is reversible only if a manifest injustice has resulted from the error. That means that if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him[.]" *Accord* KY. CONST. § 11 (In all criminal prosecutions the accused has the right. . . to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor."). The guarantees of the Sixth Amendment are made obligatory upon the states by virtue of the Fourteenth Amendment to the United States Constitution. *Pointer v. Texas*, 380 U.S. 400 (1965). "One of the most basic of the rights guaranteed by the Confrontation Clause is the

accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970).

Nevertheless, it is well-established that "[m]ost rights. . . constitutional rights included, may be waived." *Commonwealth v. Simmons*, 394 S.W.3d 903, 907 (Ky. 2013) (citing *Commonwealth v. Townsend*, 87 S.W.3d 12, 15 (Ky.2002)), *accord Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "[T]he validity of any waiver of a constitutional right, as well as the inquiry required by the court to establish a valid waiver, will depend on the circumstances of the particular case and the nature of the constitutional right at issue." *Simmons*, 394 S.W.3d at 907. But our courts may not presume the waiver of a fundamental right from a silent record. *Zerbst*, 304 U.S. at 464. Rather, "[t]he waiver of a constitutional right must be given voluntarily, knowingly, and intelligently 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Simms v. Commonwealth*, 354 S.W.3d 141, 143 (Ky. App. 2011) (quoting *Brady v. U.S.*, 397 U.S. 742, 748 (1970)). However, there is no question that a defendant need not always verbalize his intent to waive a constitutional right and may instead waive certain rights through conduct. *Allen*, 397 U.S. at 342-43 ("No doubt the privilege (of personally confronting witnesses) may be lost by consent or at times even by misconduct.").

In *Allen*, the United States Supreme Court made clear that there are circumstances in which a defendant's Sixth Amendment right to be present may be waived by his actions. In *Allen*, the defendant refused court appointed counsel and insisted on representing himself. 397 U.S. at 339. The trial court

granted his request but appointed counsel to assist him in protecting the record. *Id.* During voir dire, after the court instructed his court appointed counsel to proceed with examination of the venire, the defendant argued with and threatened the trial court and disrupted the proceedings. *Id.* at 339-40. The trial court warned the defendant that if he continued to make outbursts he would be removed. *Id.* at 340. The trial court had the defendant removed after his continued outbursts and jury selection continued in his absence. *Id.* The trial court allowed the defendant back into the courtroom at the beginning of trial conditioned on his ability to behave himself. *Id.* After his appointed counsel invoked the rule to remove the witnesses from the courtroom, he again became disruptive and was removed. *Id.* at 340-41. The defendant remained out of the courtroom for the entirety of the prosecution's proof. *Id.* at 341. The defendant was then permitted to return to the courtroom and, as he behaved himself, was present for the remainder of the trial. *Id.*

On appeal, the Supreme Court rejected the Court of Appeals' holding that "the defendant's Sixth Amendment right to be present at his own trial was so 'absolute' that, no matter how unruly or disruptive the defendant's conduct might be, he could never be held to have lost that right so long as he continued to insist upon it" and that the solution under such circumstances was "to have restrained the defendant by whatever means necessary, even if those means included his being shackled and gagged." *Id.* at 342. Instead, the *Allen* Court held that a defendant could lose his right to be present at trial if, after being warned by the judge, "he continues his disruptive behavior, he nevertheless

insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Id.* at 343. It reasoned:

> It is not pleasant to hold that the respondent Allen was properly banished from the court for a part of his own trial. But our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. **Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him**. **It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes**. . . Being manned by humans, the courts are not perfect and are bound to make some errors. But, if our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the Illinois trial judge in this case.

*Id*. at 346-47 (emphasis added), *see also Taylor v. United States*, 414 U.S. 17 (1973) (holding that the defendant's voluntary absence after trial began in his presence constituted a voluntary waiver of his right to be present).

*Wilson v. Harris*, 595 F.2d 101 (2d Cir. 1979), is also illustrative of the tenet that waiver of the right to be present may be apparent from conduct alone. On the morning of Wilson's trial, "pursuant to orders of the trial judge, Wilson's counsel and the prosecutor went to the Manhattan House of Detention to interview Wilson, who knew that his trial was to begin that day." *Id*. at 103. The parties reported back to the court that "Wilson refused to see them or to see anyone connected with the case and on that day he had reaffirmed his refusal 'to come to court.'" *Id*. The trial court, "satisfied that Wilson, knowing his trial was to begin forthwith, had voluntarily waived his right to be present,

29

began the trial." *Id.* The trial continued in his absence, and he was ultimately convicted. *Id.* On appeal, the Second Circuit framed the issue as follows:

> whether the record adequately sets forth that petitioner knew of his trial, knew that his trial was to start on December 7, 1972, and that, so informed, he deliberately endeavored to frustrate its commencement and continuation and, therefore, knowingly and voluntarily waived his constitutional rights to be present throughout the trial; and whether, the petitioner being in custody, it was necessary either for him to have been physically brought before the state trial judge so that there could be a record in open court of the waiver or for that judge to have used other means to obtain an express waiver from the defendant.

*Id.* The Court held that Wilson

> **knew when his trial was to begin, and he had no unilateral right to determine the time or the circumstances under which he would stand trial**. **His flat refusal to attend the trial was, without question, an explicit and intentional relinquishment of a known right and an undeniable waiver of his constitutional right to be present in court at the trial and to confront adverse witnesses**. He knew on December 7 that his trial was to start that day, and on December 8 he knew that it was in process. . .He had the opportunity to be present but, by his own volition, chose to forego that opportunity.

*Id.* at 103-04 (emphasis added).

The criminal procedural rule at issue, RCr 8.28(1), reflects a defendant's constitutional right to be present at trial and other critical stages of the proceedings against him. But it further contemplates that a defendant, by intentionally refusing to appear, i.e., through his conduct, may waive the right to be present. It provides in relevant part:

> The defendant shall be present at the arraignment, at every critical stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of the sentence. The defendant's voluntary absence after the trial has been commenced in his or her presence shall not prevent proceeding with the trial up to and including the verdict. . . . Upon a hearing and finding by

30

the trial court, that a defendant in custody on any charge, including a felony, intentionally refuses to appear for any proceeding, including trial, short of physical force, such refusal shall be deemed a waiver of the defendant's right to appear at that proceeding.

Sloss alleges that the trial court reversibly erred by altogether failing to hold a hearing pursuant to RCr 8.28(1). He contends that this rule required the trial court to hold a formal evidentiary hearing and that the trial court was precluded from finding that Sloss waived his right to be present without speaking to Sloss directly. We disagree.

To begin, there is nothing in the plain language of RCr 8.28(1) that requires a formal evidentiary hearing, and the term "hearing" is not defined by the Kentucky Rules of Criminal procedure. *See* RCr 1.06. While certainly the term "hearing" can evoke the idea of swearing in witnesses and formally submitting evidence into the record, often during normal pre-trial practice "hearings" occur in the form of nothing more than discussions between the court and the parties which in turn result in the court issuing a ruling. Although a trial court is certainly free to hold a formal evidentiary hearing under RCr 8.28(1) if it so chooses, we hold that a formal evidentiary hearing is not required to satisfy the rule. The very facts of this case demonstrate why a formal evidentiary hearing is not necessary for the court to validly reach the conclusion that a defendant has waived his or her right to be present at trial.

We hold that the conversations that the trial court had with counsel on the record about Sloss' refusal to attend trial, coupled with the court's personal knowledge of Sloss' behavior throughout the proceedings, constituted sufficient

31

"hearings" under RCr 8.28(1). We further hold that, based on these hearings, the trial court made the requisite finding that Sloss refused to attend his trial, short of being forced, and therefore waived his constitutional right to be present.

From the outset of the criminal proceedings against Sloss the trial court witnessed firsthand his outright refusal to aid counsel in his defense and his complete apathy towards the situation in which he found himself. The trial court repeatedly advised Sloss, to no avail, that a failure to participate in his own defense would almost certainly have disastrous consequences. Indeed, the trial court was concerned enough about Sloss' behavior to *sua sponte* order a KCPC competency evaluation. But that evaluation confirmed the court's suspicion that Sloss' behavior was the result of his own choices rather than a mental defect. In addition, during a pretrial hearing Sloss made it clear to the court that he would refuse to come back to court and that the court would have to "make him" come back. We acknowledge that Sloss thereafter attended pretrial hearings until the final status conference but believe Sloss' statements to the court were significant because they put the court on notice that, in the event Sloss chose not to be present, he would have to be physically forced to return. It is also notable that Sloss filed a pre-trial, *pro se* motion into the record to voluntarily waive all rights to a trial.

The foregoing information was already known by the trial court when the parties appeared for the first day of trial. The court did not need any witnesses to be sworn or have any evidence formally placed in the record to apprise it of

32

these facts. And, on the mornings of the first two days of trial, the trial court had extensive discussions with the parties regarding how to proceed and did everything within its power to give Sloss the opportunity to change his mind. On October 17, Sloss' counsel informed the court that Sloss was refusing to participate in the trial and was refusing to put on the clothes counsel had purchased him. As an attorney licensed in the Commonwealth, Sloss' attorney owed a duty of candor to the court, SCR[10] 3.130(3.3), and there is no reason to believe that his statements that day or throughout the rest of the trial would have been any different if the court had first placed him under oath. Despite the fact that Sloss made it clear that day that he did not want to be present for trial, the trial court still granted defense counsel both the afternoon and the evening to try to reason with him.

On the following day, October 18, Sloss refused to even be transported to the courthouse even though there was a transport order in place that legally obligated the department of corrections to transport him. The court had spoken to someone in corrections that morning who informed him that Sloss "in very colorful" language had refused to be transported and had no intention of being present for trial. As the jail was under a legal obligation to deliver Sloss that morning, there was no reason for the court to place someone under oath to testify that Sloss was refusing to be transported. Moreover, Sloss' act of refusing to come was in and of itself a statement to the court that he did not

---

[10] Supreme Court Rule.

intend to be present. And, significantly, his counsel made it clear that Sloss knew his trial was going to start that day and that he had been advised that his chances of succeeding at trial were drastically diminished if he did not attend.

After being apprised of this information, the court found that its only two options were to "accede to his wishes or drag him up here" and that it did not want to "[strap] him to a chair" in front of the jury. We hold that this constituted the requisite finding under RCr 8.28(1) that Sloss was refusing to attend trial "short of physical force," and that the trial court was therefore permitted to find, as it did, that Sloss was waiving his right to attend trial. Based on Sloss' continued refusals to participate in the penalty phase and sentencing, the trial court correctly found that he had waived his right to be present at those proceedings as well.

Before this Court, Sloss faults the trial court for not halting the proceedings, while the empaneled jurors were kept waiting, to go to the jail to speak to Sloss directly, to have Sloss appear by video, or to obtain a sworn statement from him that he was waiving his right to be present. But nothing in RCr 8.28(1) required the court to do so, nor were those requests made by Sloss' counsel. The only thing the court was required to do was hold a "hearing" and issue a finding that Sloss was refusing to attend trial "short of force" and that he had therefore waived his right to be present. It did so. And, because Sloss knew trial was going to begin that day, knew that he had a right to be present, and knew that his failure to attend could be ruinous to his chances of success,

34

we hold that "[h]is flat refusal to attend the trial was, without question, an explicit and intentional relinquishment of a known right and an undeniable waiver of his constitutional right to be present[.]" *Wilson*, 595 F.2d at 103. No error, palpable or otherwise, occurred.

**B. The trial court did not err by denying Sloss' motion for a mistrial.**

Sloss' next argument is that the trial court reversibly erred by failing to grant his motion for a mistrial after the lead detective in the case impermissibly commented on his right to remain silent. This issue was properly preserved for our review by Sloss' request for a mistrial. We will accordingly uphold the trial court's ruling unless it constituted an abuse of discretion. *Bray v. Commonwealth*, 68 S.W.3d 375, 383 (Ky. 2002). An abuse of discretion occurs if the trial court's "decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). "A mistrial is appropriate only where the record reveals a manifest necessity for such an action or an urgent or real necessity." *Bray*, 68 S.W.3d at 383.

During the Commonwealth's direct examination of the lead detective, Anthony Sumerall, it was discussing his investigation of the case when the following exchange occurred:

**CW:**[11] At some point was an arrest made in this case?

**Sumerall:** Yes.

**CW:** And when was that?

---

[11] Commonwealth.

**Sumerall:** On February 6.

**CW:** Okay, and Mr. Sloss was located and arrested?

**Sumerall:** Yes.

**CW:** And he was charged at that point with what?

**Sumerall:** Okay, on February 6 Mr. Sloss was located and detained and brought to our office.  He did not give me a statement at the time—

**Court:** Stop.  Approach.

During the bench conference the trial court, clearly irate, said,  "I knew it, I knew g*d d*mn well.  He's a terrible witness, and I knew g*d d*mn well he was going to say that."  Defense counsel immediately requested a mistrial, which the court denied.  Without waiving his objection, counsel requested an admonition.  The trial court immediately provided a thorough admonition as follows:

> I can't believe I have to say this, obviously a person doesn't have to give a statement to police.  They have an absolute right not to talk to the police and the fact that he didn't is not evidence of anything. It should not have been mentioned by this officer in any way because it calls attention to it, and you're not supposed to do that. We're not supposed to think about that, we're not supposed to have any consideration at all if the decision is made not to talk to police because you have an absolute right not to talk to the police. An absolute right.  So you are not to consider that statement. You're not going to forget it, I mean I can't erase that part of your brain where it is, but what I'm telling you is that you may not consider that statement in any way, shape, or form in deciding whether or not the Commonwealth has proven its case, and if you can't do that let me know.  Can everyone assure me that that's not going to be part of your consideration when you go to decide this case?  Anybody have any hesitation or reservation about that?

None of the jurors indicated that they could not follow the admonition, and the Commonwealth proceeded with its examination. The fact that Sloss declined to speak to police was never mentioned again.

In general, "[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody." *Hunt v. Commonwealth*, 304 S.W.3d 15, 35 (Ky. 2009). However,

> not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence is deliberately used to impeach an explanation subsequently offered at trial or where there is a similar reason to believe the defendant has been prejudiced by reference to the exercise of his silence as a prosecutorial tool. The usual situation where reversal occurs is where the prosecutor has repeated and emphasized post-arrest silence as a prosecutorial tool.

*Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983), *see also Hunt v. Commonwealth*, 304 S.W.3d 15, 36 (Ky. 2009). Here, Det. Sumerall's comment was a single, fleeting statement that it occurred during a five-day trial. It was not responsive to the question asked by the Commonwealth and Sloss' decision to remain silent was never even mentioned by the Commonwealth again, let alone used as a prosecutorial tool. Moreover, the trial court provided an extensive admonition immediately after the comment occurred. "A jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003) (citing *Mills v. Commonwealth*, 996 S.W.2d 473, 485 (Ky. 1999)).

> There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an

37

overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant or (2) when the question was asked without a factual basis and was "inflammatory" or "highly prejudicial."

*Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky. 2003) (internal citation omitted). Sloss alleges that the court's admonition was insufficient to cure the error because there was a strong possibility that jury would have been unable to follow it simply because he was not present at trial. We disagree. There is no reason to assume that Sloss' absence, alone, would render the jury unable to follow the court's admonition. We therefore hold that the trial court did not abuse its discretion by denying Sloss' motion for mistrial.

## C. The trial court did not err by denying Sloss' motions for directed verdict for the charges of murder and abuse of a corpse.

Next, Sloss contends that the trial court erred by denying his motions for directed verdict on the charges of murder and abuse of a corpse. At the close of the Commonwealth's proof, defense counsel moved for directed verdict on both counts. Defense counsel asserted the Commonwealth failed to prove the charge of murder because there had been no direct evidence that indicated that Sloss was the person that killed Amanda. Regarding abuse of a corpse the defense argued that, as there was no proof that Sloss murdered Amanda, there was no proof that he did anything with her body. The trial court denied the motions. At the close of the defense's proof, defense counsel renewed his motions for directed verdict. The sole argument he asserted for both charges was that the Commonwealth did not put on any proof that the body found in

38

the basement was identified as Amanda. The trial court again denied the motions.

Before this Court, Sloss contends that the trial court erred by denying his motion for directed verdict in relation to his murder charge because there was insufficient proof that he killed Amanda and because there was insufficient proof that the body found in the basement was in fact Amanda. And, he argues the trial court erred by denying his motion for directed verdict on the charge of abuse of a corpse because, again, the Commonwealth failed to prove that he was the individual that killed Amanda and because it failed to prove that her body was disposed of in a way that "would outrage ordinary family sensibilities" pursuant to Kentucky Revised Statute (KRS) 525.120(1). We address these arguments in reverse order.

To begin, Sloss' argument that the body was not disposed of in a way that would outrage ordinary family sensibilities and therefore could not constitute abuse of a corpse was not raised before the trial court and is consequently unpreserved. "The failure to identify a particular ground in a motion for directed verdict forecloses appellate review of the trial court's denial of the motion except to the extent that palpable error is shown." *Murphy v. Commonwealth*, 509 S.W.3d 34, 42 (Ky. 2017) (citing *McCleery v. Commonwealth*, 410 S.W.3d 597, 601–602 (Ky. 2013)).

Upon review of the record, this Court concludes that the evidence was sufficient to prove that the way Amanda's body was disposed of—that is, naked, beaten, and strangled, stuffed face down in the fetal position in a

39

plastic tub and left to decay and grow mold for weeks in a cold, dark basement—was more than enough to outrage ordinary family sensibilities. Any conclusion to the contrary would be inhumane and inane. Accordingly, no manifest injustice resulted. *Cf. Yates v. Commonwealth*, 430 S.W.3d 883, 888 (Ky. 2014) (holding that failure to prove the forcible compulsion element of first-degree rape resulted in manifest injustice).

Next, we conclude that Sloss' arguments that there was insufficient proof that he killed Amanda and that there was insufficient proof that Amanda was the decedent were properly preserved for review. *See Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020); RCr 9.22. When ruling on a motion for directed verdict, "the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). If the trial court concludes that the "evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty," it should not grant a directed verdict. *Id.* "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.*

While Sloss is correct that there was no direct proof entered into evidence that he murdered Amanda or that the body found in the basement was

Amanda's,[12] "[c]ircumstantial evidence is sufficient to support a criminal conviction as long as the evidence taken as a whole shows that it was not clearly unreasonable for the jury to find guilt." *Bussell v. Commonwealth*, 882 S.W.2d 111, 114 (Ky. 1994) (citing *Trowel v. Commonwealth*, 550 S.W.2d 530 (Ky. 1977)). Circumstantial evidence may also be sufficient to prove the identity of a decedent, as long as the identity is shown by proof beyond a reasonable doubt. *Powell v. Commonwealth*, 123 S.W.2d 279, 285 (Ky. 1938).

In a light most favorable to the Commonwealth, the evidence presented was that Amanda met Sloss through a pen pal program and had known him for only briefly before moving in with him. As Amanda had been a lifelong resident of Bell County, Sloss was the only person she knew in Louisville when she moved there. And, as she had no job, no car, no phone of her own, and was struggling with SUD, her life was in many ways controlled by Sloss. Sloss' control over Amanda was in fact so great that he coerced her into engaging in sex work, at least for a time, against her will.

Four different witnesses testified that Sloss and Amanda argued on a regular basis and that those arguments frequently resulted in Sloss being violent. Those witnesses at various times saw Amanda with a busted lip, black eyes, bruises on her throat, and bruises on her arms and legs. The bruising to her neck and the injuries to her face were particularly noteworthy because Amanda's cause of death was multiple blunt force trauma to the head and

[12] The body's state of putrefaction rendered it unrecognizable.

manual strangulation. Amanda told Mary Sparks that Sloss was the individual that inflicted those injuries and there was no evidence that anyone other than Sloss had been violent towards her in the months preceding her death. Dwayne Crutcher witnessed Sloss' deplorable actions against Amanda firsthand.

Mary Sparks testified that the last time she saw Amanda, she was talking about leaving Sloss. And Karen Bolin testified that sometime in the middle of January 2020, at 3 a.m., she heard Amanda and Sloss having an argument that was "louder" than usual. During this argument Karen heard the back door to their home slam, and she never saw Amanda again. The medical examiner testified that Amanda had been dead for "weeks" when her body was found on January 30, 2020.

After Amanda disappeared, Sloss gave several different stories to numerous people about where she was. At various times, he told people she had left with another man, that she went back home, that he did not know where she was, etc. Sloss told Amanda's mother Teresa that he had not been able to contact Amanda and did not know where she was, but he never contacted the police out of concern for her wellbeing. Instead, Teresa alerted the police to the situation and directed them to the house that Amanda and Sloss had been living in. There was no evidence that anyone other than Amanda and Sloss had been living in that house in the months preceding her death. Amanda's body was ultimately discovered because Sloss called John Sloss and directed him to where the body was, and it was evident that Sloss

42

had still been living in that house on the day the search warrants were executed because several lights and space heaters were on throughout it. Once Amanda's body was discovered, LMPD informed Teresa that it was Amanda's body, and we presume that Teresa ultimately took custody of that body for burial or cremation.

Based on the foregoing, the trial court did not abuse its discretion by denying Sloss' motions for directed verdict, and we hold that it would not have been clearly unreasonable for the jury to find that Sloss murdered Amanda and that the body discovered in the basement was Amanda.

## D. The trial court did not abuse its discretion by admitting the testimony of Mary Sparks and Dwayne Crutcher regarding Sloss' past abuse of Amanda.

Sloss argues that the Commonwealth failed to give adequate notice of its intention to introduce the testimony of Mary Sparks and Dwayne Crutcher about Sloss' past abuse of Amanda, and that the testimony itself was inadmissible under KRE 404(b).

On Sunday, October 16, 2022, the day before trial was scheduled to begin, the Commonwealth filed a notice of intent to introduce evidence pursuant to Kentucky Rule of Evidence (KRE) 404(b). The notice stated that the Commonwealth

> hereby gives notice pursuant to KRE 404(c) of its intent to introduce evidence falling within the purview of KRE 404(b) during is case in-chief.
>
> • Dwayne Crutcher witnessed Defendant try to grab the victim by the arm. He also saw defendant stomp on her. He pulled defendant off the victim. This happened outside Mr.

Crutcher's residence. Mr. Crutcher saw injuries on the victim, including a black eye and marks on her neck.

Mary Sparks never witnessed any incidents, but observed multiple injuries on the victim, including blood on her face, her hair messed up, black eyes, a busted mouth, skinned up knees, busted nose, and fingerprint marks on her neck.

This information has previously been referenced in discovery materials. The Commonwealth intends to introduce this relevant evidence because it is inextricably intertwined with other evidence essential to the case.

The following day, October 17, the Commonwealth explained during a hearing that Mary and Dwyane were spoken to during the police's initial missing person investigation. During the Commonwealth's trial preparation, it received additional information from them, and that information was reflected in her KRE 404(c) notice. The Commonwealth did not intend to introduce any other prior assaultive behavior.

The defense objected to the evidence of the prior assaultive behavior and the observations of injuries on Amanda based on a lack of notice and a lack of any indication as to when the observations and the assaultive behavior occurred. The court found that the notice was sufficient, but it initially ruled to exclude the prior acts of abuse. The court left open the possibility that the witnesses could provide testimony concerning the acts of abuse depending on what they testified to as the basis of their knowledge. The court's primary concern was avoiding undue prejudice to Sloss.

At trial, John Bolin and Karen Bolin testified before Mary Sparks and Dwayne Crutcher. The extent of John Bolin's testimony was that Amanda and Sloss argued a lot. Karen Bolin then testified, and her direct examination by

44

the Commonwealth was limited to, the fact that she was Amanda and Sloss'

neighbor, the last time she saw Amanda was either a month or two weeks

before her body was found, and that she knew Amanda and Sloss were both

drug users.  It was not until the defense cross examined Karen that the prior

abusive behavior by Sloss against Amanda was elicited.  Karen had begun to

make a statement about Amanda being involved in sex work, but the

Commonwealth cut her off with an objection.  During the bench conference,

the court noted that at that point the jury would have already figured out what

she was going to say about Amanda being involved in sex work and he believed

that evidence cut both for and against Sloss.  The trial court's concern was the

basis of Karen's knowledge for that information.

The trial court then had Karen approach the bench and from its

discussion with her it established: (1) Karen knew Amanda was engaged in sex

work against her will because their homes were in such close proximity she

could hear Amanda and Sloss arguing about it; (2) Karen could also hear what

she believed to be domestic violence against Amanda occurring, but she never

witnessed the physical abuse herself.  She did, however, see bruises on

Amanda's face, neck, and arms; and (3) On an unspecified date prior to

Amanda's disappearance at about 3 a.m. she heard them have a big fight and

heard the back door slam, and she never saw Amanda again.

The trial court concluded that the information Karen had just provided

was testimony that the jury had a right to hear and that it was "so painfully

relevant" that it was inclined to allow it. When the defense resumed its cross-examination of Karen it elicited all of the information listed above.

Later, prior to the testimony of Mary Sparks and Dwayne Crutcher, the parties approached the bench and the defense asked for clarification regarding the court's ruling on their testimony about the injuries they observed and the timing of what they saw. The court found that "the genie was out of the bottle" on that issue, as there had been testimony elicited from both sides about "fighting, arguing, bruising." The court found that the basis for its initial ruling was to prevent any potential prejudice to Sloss from discussing that information. But, as that information had already been elicited from other witnesses, talking about it more would not result in additional prejudice to Sloss. It found:

> it's certainly relevant and probative as to who may have killed her if she was afraid of the person who was arguing with her and beating her on occasion and she was trying to get away from him. It's clearly relevant, clearly probative, and the prejudicial impact of that has been greatly lessened by the previous testimony in terms of the fact that these people argued quite a bit and that she had apparently suffered physical injuries as a consequence of those arguments.

Defense counsel did not object to Dwayne Crutcher's testimony.

In criminal cases, KRE 404(c) mandates that the Commonwealth "shall give reasonable pretrial notice to the defendant of its intention to offer [prior bad acts] evidence." The purpose of this evidentiary rule is "to provide the accused with an opportunity to challenge the admissibility of [prior bad act] evidence through a motion in limine and to deal with reliability and prejudice problems at trial." *See, e.g., Walker v. Commonwealth*, 52 S.W.3d 533, 538

(Ky. 2001) (quoting *Tamme v. Commonwealth*, 973 S.W.2d 13, 31 (Ky. 1998)).

"Whether reasonable pre-trial notice has been given is decided on a case-by-case basis." *Walker*, 52 S.W.3d at 538. In this case, while Commonwealth's KRE 404(c) notice may have been late coming, it served the purpose of the notice rule in that it gave the defense the opportunity to object to the evidence and obtain a ruling from the court concerning its admissibility. The trial court accordingly did not abuse its discretion in determining that the notice was sufficient.

Next, as for the admissibility of the evidence under KRE 404(b), that rule directs that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence may be admissible "if offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). Due to the inherent prejudicial nature of this kind of evidence, KRE 404(b) has always been interpreted as being exclusionary in nature, and trial courts are expected to "apply the rule cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). But, as this Court noted in *Driver v. Commonwealth*,

> "It has long been a rule in this jurisdiction that threats [and the use of prior actual force] against the victim of a crime are probative of the defendant's motive and intent to commit the crime[.]" *Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky.2004) (citing *Richie v. Commonwealth*, 242 S.W.2d 1000, 1004 (Ky.1951)); *see*

47

*also Davis v. Commonwealth*, 147 S.W.3d 709, 722 (Ky.2004) ("[g]enerally, evidence of prior threats and animosity of the defendant against the victim is admissible as evidence of … intent."); *Harp v. Commonwealth*, 266 S.W.3d 813 (Ky.2008) ("As we have definitively held, 'evidence of similar acts perpetrated against the same victim are almost always admissible....' ").

361 S.W.3d 877, 884 (Ky. 2012). The foregoing general rule is limited in one important respect: "prior acts are not admissible when the conduct occurred too remote in time to fairly represent any reasonable application to the present crimes." *Id.* Sloss attempts to seize upon this limitation by asserting that the prior bad acts were not admissible because there is no indication as to when they occurred. While it is true that neither Mary Sparks nor Dwayne Crutcher could provide exact dates regarding the prior instances of violence or their observations of Amanda's injuries, it is clear from context that everything they observed had to have taken place within the five to six months between Amanda moving in with Sloss in July 2019 and when she was murdered sometime between December 2019 and January 2020. Five to six months is certainly not "too remote in time to fairly represent any reasonable application to the present crimes." *Id.* We therefore hold that the trial court did not abuse its discretion by admitting this evidence.

### E. The trial court did not abuse its discretion by allowing hearsay to be admitted under the state of mind exception.

Prior to trial, Sloss objected to Mary Sparks testifying that Amanda told her she wanted to leave Sloss. The trial court overruled the objection based on its ruling that the state-of-mind exception under KRE 803(3) applied. This issue is therefore preserved, and we will review for abuse of discretion. *Mason*

48

*v. Commonwealth,* 559 S.W.3d 337, 342 (Ky. 2018). Accordingly, we must uphold the trial court's ruling unless it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). "A fundamental rule in the law of evidence is that hearsay evidence is inadmissible evidence. However, hearsay evidence may be admissible if 'it meets one of our well established exceptions.'" *Walker v. Commonwealth,* 288 S.W.3d 729, 739 (Ky. 2009) (quoting *Wells v. Commonwealth,* 892 S.W.2d 299, 301 (Ky.1995)). One such exception is the state of mind exception under KRE 803(3), which provides:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

To be admitted, evidence that meets the state of mind exception must still meet the relevancy standards of KRE 401-403. *Sturgeon v. Commonwealth,* 521 S.W.3d 189, 198 (Ky. 2017). The state of mind exception is also limited

> to a statement about a then-existing mental state or condition. The "crucial component of this [exception] [i]s contemporaneity of the declarant's state of mind and the statement describing it," and it "le[aves] no room for the use of a statement describing a state of mind that existed at some early time." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.5[2][a], at 648 (5th ed. 2013). The statement cannot be about a "past fact," but must instead "cast light upon her future intentions," *Ernst v. Commonwealth,* 160 S.W.3d 744, 753 (Ky. 2005), which includes statements of present or then-existing mental states.

> Thus, the statement "I felt scared yesterday" would not be admissible, but the statement "I feel scared now" would be[.]

*Dillon v. Commonwealth*, 475 S.W.3d 1, 22–23 (Ky. 2015).

Sloss asserts before this Court that Mary's testimony was inadmissible hearsay because it was offered to prove the truth of the matter asserted: that Sloss regularly abused Amanda and she wanted to leave him. We disagree. While it is true that Amanda's conversation with Mary occurred in the past, it demonstrated her then-present intention concerning a future event: she wanted to leave Sloss because of the months of abuse she had endured.

> Additionally, this Court has consistently determined that a victim's statement concerning future plans to break off a relationship with the offender is admissible as state of mind evidence. *See, e.g.*, *Dillon*, 475 S.W.3d at 23 (victim's statements to daughter that she planned on leaving the appellant and moving to a different state were admissible under KRE 803(3)); [*Crowe v. Commonwealth*, 38 S.W.3d 379, 383 (Ky. 2001)] (victim's statements to coworkers that she planned on filing for divorce from appellant demonstrated her mental state).

*Rucker v. Commonwealth*, 521 S.W.3d 562, 571-72 (Ky. 2017). Mary testified that the last time she saw Amanda, she was planning to leave Sloss because their relationship was getting progressively worse, and she no longer wanted to be abused. During that conversation, she and Mary also discussed getting permission from Amanda's parole officer to allow her to move in with Mary until she could find other arrangements. We accordingly hold that Amanda's statements were properly admitted under the state of mind exception to the rule against hearsay and that the trial court did not abuse its discretion by admitting them.

50

## F. No cumulative error occurred.

For his final assertion, Sloss contends that cumulative error occurred necessitating reversal. "Cumulative error is a doctrine 'under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair.'" *Commonwealth v. Harbin*, 602 S.W.3d 166, 174 (Ky. App. 2019). Cumulative error has previously been found "only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citing *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010)). We hold that no cumulative error occurred in this case.

## III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. Bisig, Conley, and Thompson, JJ., concur. Nickell, J., dissents by separate opinion in which VanMeter, C.J., and Keller, J., join.

NICKELL, J., DISSENTING: Respectfully, I dissent. Distilled to its essence, the majority concludes the trial court made an implied finding of waiver following an implied hearing based on nothing more than hearsay and double hearsay. I cannot agree such an implied finding of waiver is sufficient to hold Sloss positively and intentionally waived a fundamental constitutional right.

More than two centuries ago, in discussing the importance of the Confrontation Clause, Chief Justice Marshall pointedly cautioned, "I know of no principle in the preservation of which all are more concerned. I know none,

51

by undermining which, life, liberty, and property, might be more endangered. It is therefore incumbent on courts to be watchful of every inroad on a principle so truly important." *U.S. v. Burr*, 25 F.Cas. 187, 193 (No. 14,694) (CC Va. 1807). Ninety years later, the Supreme Court of the United States reiterated that the Sixth Amendment's right to confrontation was "[o]ne of the fundamental guaranties of life and liberty . . . a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the constitution of the United States and in the constitutions of most, if not of all, the states composing the Union." *Kirby v. U.S.*, 174 U.S. 47, 55-56 (1899).[13] More recently, Justice Scalia wrote:

> The Sixth Amendment gives a criminal defendant the right "to be confronted with the witnesses against him." This language "comes to us on faded parchment," *California v. Green*, 399 U.S. 149, 174, 90 S.Ct. 1930, 1943, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring), with a lineage that traces back to the beginnings of Western legal culture. There are indications that a right of confrontation existed under Roman law. The Roman Governor Festus, discussing the proper treatment of his prisoner, Paul, stated: "It is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face, and has been given a chance to defend himself against the charges." Acts 25:16. It has been argued that a form of the right of confrontation was recognized in England well before the right to jury trial. Pollitt, The Right of Confrontation: Its History and Modern Dress, 8 J.Pub.L. 381, 384-387 (1959).

*Coy v. Iowa*, 487 U.S. 1012, 1015-16 (1988). In my view, the majority's decision today fails to heed *Burr*'s warning, disregards the historical underpinnings of the right of confrontation, and inflicts a crippling blow to a

---

[13] *See* KY. CONST. §11.

fundamental constitutional right which is essential to due process of law in a fair adversary process.

"A defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). This right is rooted in the Sixth Amendment and the due process clause of the Fourteenth Amendment to the United States Constitution as well as Section Eleven of the Kentucky Constitution. The constitutional right of a defendant to be present at all times with the aid of counsel has been long recognized in this Commonwealth. In *Temple v. Commonwealth*, 14 Bush 769, 770-71, 29 Am.Rep. 442 (Ky. 1879), this Court's predecessor held:

> The bill of rights declares "That in all criminal prosecutions the accused hath a right to be heard by himself and counsel." The right to be heard by himself and counsel necessarily embraces the right to be present himself and to have a reasonable opportunity to have his counsel present also at every step in the progress of the trial, and to deprive him of this right is a violation of that provision of the fundamental law just quoted.

> The presence of the accused is not a mere form. It is of the very essence of a criminal trial not only that the accused shall be brought face to face with the witnesses against him, but also with his triers. He has a right to be present not only that he may see that nothing is done or omitted which tends to his prejudice, but to have the benefit of whatever influence his presence may exert in his favor.

The right to be present is also explicitly set forth in RCr 8.28(1):

> The defendant shall be present at the arraignment, at every critical stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of the sentence. The defendant's voluntary absence after the trial has been commenced in his or her presence shall not prevent proceeding with the trial up to and including the verdict. The defendant may

53

be permitted to remain on bail during the trial. Upon a hearing and finding by the trial court, that a defendant in custody on any charge, including a felony, intentionally refuses to appear for any proceeding, including trial, short of physical force, such refusal shall be deemed a waiver of the defendant's right to appear at that proceeding.[14]

The right to be present is intended to protect a defendant against purposeful or involuntary exclusion, but not voluntary exclusion. *See, e.g., Price v. Commonwealth*, 31 S.W.3d 885, 892 (Ky. 2000). It is a defendant's personal right under the Sixth Amendment and Section Eleven and may, therefore, be waived. *See Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 379-80 (1979). Even "[t]he most basic rights of criminal defendants are . . . subject to waiver." *New York v. Hill,* 528 U.S. 110, 114 (2000) (quoting *Peretz v. United States,* 501 U.S. 923, 936 (1991)). However, any such waiver must be sufficiently clear "as to indicate a conscious intent." *Powell v. Commonwealth*, 346 S.W.2d 731, 734 (Ky. 1961). The standard for finding a waiver of a defendant's right to be present should be evaluated as any other constitutional right which requires "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). These important rights "may be waived only by a voluntary and knowing action." *Boyd v. Dutton*, 405 U.S. 1, 2-3 (1972). The United States Court of Appeals for the District of Columbia Circuit has further explained the importance of obtaining an explicit on-the-record waiver.

---

[14] The final sentence which permits a waiver only after a hearing and finding by the trial court was added to the rule by Order 2009-01, and became effective April 1, 2009, some thirteen years before trial in this matter commenced.

On the subject of waiver, "it has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' . . . This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." *Cross* [*v. United States*], 325 F.2d [629,] 631 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464-65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Where the defendant is in custody, "'the serious and weighty responsibility' of determining whether he wants to waive a constitutional right requires that he be brought before the court, advised of that right, and then permitted to make 'an intelligent and competent waiver.'" *Id.*

In applying this rule to the instant case, it is clear that rather than permitting defense counsel to waive [the defendant's] right to presence, the court should have held an on-the-record hearing to advise [the defendant] of his right to be present at voir dire and obtained a personal waiver in open court. The slight additional burden on the criminal justice process wrought by a personal waiver requirement is more than offset by avoidance of lengthy appeals to determine whether the defendant's right to presence has been violated. The practice of obtaining open court waivers is, as we have noted, particularly warranted in cases like this where the defendant is not out on bail, but remains in custody and readily available to the court.

Further, we find an on-the-record-waiver desirable because in its absence it is difficult, if not impossible, to determine whether the defendant has knowingly and intelligently relinquished a known right.

*United States v. Gordon,* 829 F.2d 119, 125-26 (D.C. Cir. 1987) (footnote omitted).

Based on these authorities, it is plain that a defendant's fundamental constitutional right to be present to confront his accusers and any witnesses against him is not of recent vintage, nor is its existence something which can be seriously doubted or questioned. This right should be protected with equal fervor to all other fundamental constitutional rights.

55

For instance, before a defendant may enter a guilty plea, which "constitutes a waiver of several fundamental constitutional rights[,]" due process demands that to be valid the plea "must be knowing, intelligent, and voluntary." *Haight v. Commonwealth*, 760 S.W.2d 84, 87-88 (Ky. 1988) (citing *Boykin v. Alabama*, 395 U.S. 238 (1969); *Brady v. United States*, 397 U.S. 742 (1970)). Under *Boykin*, a trial court must make an affirmative showing on the record that a guilty plea is intelligent and voluntary before it may be accepted. 395 U.S. at 242.

Waiver of the defendant's right to a jury trial—one of the fundamental constitutional rights lost when entering a guilty plea—cannot be presumed from a silent record. *Id.* at 243. RCr 9.26, which was promulgated by this Court over forty years ago, requires a defendant's waiver of his right to be tried by a jury to be "in writing with the approval of the court and the consent of the Commonwealth." RCr 9.26(1). No separate colloquy or inquiry by the trial court is required because "the rule presumes voluntariness from a written waiver" and the "writing requirement is designed to impress the defendant with the gravity of the right relinquished and provide[s] the best evidence of the defendant's voluntary consent." *Marshall v. Commonwealth*, 60 S.W.3d 513, 522 (Ky. 2001) (quoting *United States v. Martin*, 704 F.2d 267, 271 (6th Cir. 1983)).

Furthermore, before a defendant may waive his constitutional right to counsel, due process demands he be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that he

56

knows what he is doing and his choice is made with eyes open." *Faretta v. California*, 422 U.S. 806, 835 (1975) (internal quotation marks omitted). This Court has explained "as to the Sixth Amendment . . . the constitutional minimum for determining whether a waiver was 'knowing and intelligent' is that the accused be made sufficiently aware of his right to have counsel present and the possible consequences of a decision to forego the aid of counsel." *Depp v. Commonwealth*, 278 S.W.3d 615, 618 (Ky. 2009) (analyzing *Iowa v. Tovar*, 541 U.S. 77 (2004)). Although no specific script or "magic words" are required, a trial court must make an adequate record which is sufficient for a reviewing court to determine the correctness of the finding of waiver. *Id.* at 618-19.

Based on my review of the record, I do not believe Sloss's fundamental constitutional right to be present was adequately protected. Nor can I agree with the majority's conclusion that Sloss voluntarily waived his right pursuant to RCr 8.28(1).

This is not a case wherein a defendant has forfeited his right to be present, thereby relieving the trial court of the obligation to conduct a *Boykin*-type inquiry. Sloss was not removed from the courtroom for being unruly and disruptive as was the defendant in *Allen*, 397 U.S. at 340, et seq. Nor did Sloss ever threaten to be disorderly, disruptive, or disrespectful warranting his involuntary removal or banishment from the courtroom. Additionally, it is abundantly clear that Sloss did not voluntarily absent himself after the commencement of trial, so the provision of RCr 8.28(1) permitting trial in his

absence in such a circumstance is inapplicable. Thus, the focus must be on the remaining provisions of RCr 8.28(1) and the cases cited above to make a proper determination of whether a finding of a waiver was appropriate.

Pertinent to this matter, before a defendant in custody may be deemed to have waived his right to be present, the plain and unambiguous language of RCr 8.28(1) requires a trial court to conduct a hearing and make several findings. The court must conclude the defendant is in custody, that he is intentionally refusing to appear, and nothing short of physical force will compel his attendance.

Unlike the provisions of RCr 9.26 which requires a waiver of a defendant's right to a jury trial to be in writing, no rule or statute specifies the appropriate method for waiving the right to be present "at every critical stage of the trial." While I do not today advocate for implementing a formalistic process for effectuating a waiver, a record must be made from which it is clear that a defendant knows or is advised of his rights, and that he is voluntarily relinquishing that known right. However, in my view, the trial court did not do so here and the majority's decision to sanction the loss of Sloss's entitlement to be present based on the trial court's deficient finding of a voluntary waiver erodes the rights of all defendants who shall hereafter appear before the trial courts of this Commonwealth.

Although multiple on-the-record discussions occurred regarding Sloss's recalcitrant and obstreperous behavior, noticeably lacking in the instant case is any colloquy between the trial court and Sloss in which Sloss was apprised

58

of his right to be present and the hazards of waiving such right. Nor was there a hearing at which competent evidence was introduced. I am unconvinced by the majority's assertion that the "conversations" the trial court conducted with counsel qualify as a hearing. I am even more unconvinced the trial court made the requisite findings to comply with RCr 8.28(1). While I concede that a waiver may be implied and not express, the record must contain some evidence of substance and reliability to support the implication. No such competent evidence appears in the record before us today. The majority's conclusion to the contrary misses wide of the mark.

Certainly, RCr 8.28(1) contains language permitting a trial to continue in a defendant's voluntary absence after the trial has commenced. But where, as here, the defendant is absent and trial has not gotten underway, the rule requires "a hearing and finding by the trial court" that the defendant is in custody and is intentionally refusing to appear. The trial court must further conclude the only way to compel the defendant's presence is through the use of physical force. Should these conditions be met, only then may a defendant be deemed to have voluntarily waived his constitutional right to be present.[15] But "[t]here is no conclusive presumption of voluntariness from the mere fact of

_____

[15] There are clearly times when a defendant in custody could waive his right to be present. However, a defendant who is in custody is not personally in control of his own presence or absence as would be a defendant who has been released on bail. Indeed, it is difficult to imagine a scenario where such a defendant, short of effectuating an escape, can be said to have voluntarily absented himself from trial, considering he is under the custody and control of the jailer and is incapable of free volition as to his movements.

59

absence; the defendant is entitled to show that his absence was not voluntary."
*McKinney v. Commonwealth*, 474 S.W.2d 384, 386 (Ky. 1971) (citing *Fleming v. Commonwealth*, 280 S.W.2d 148 (Ky. 1955)).

Because the right to be present is a fundamental constitutional right, trial courts should ensure a defendant is proceeding with "eyes open" and issue warnings of the dangers of absenting oneself from trial prior to determining a waiver has occurred. Doing so creates a record from which it can readily be determined that any such waiver was knowing, voluntary, and intelligent.

Thus, an on-the-record hearing—as required by rule—should occur as such determinations can rarely, if ever, be made in passing or without consideration of the specifics of the particular case and individual defendant at bar. Although no "magic words" need be employed, a defendant must, at a minimum be questioned about his desire to intentionally refuse to appear and thus waive his right to appear at trial and appropriate findings shall be made. "When a defendant expresses a desire not to attend trial, the district court must ensure that the defendant knows that he has the opportunity to attend and knows the ramifications of his choices so that the decision to waive his right will be intelligently made." *U.S. v. Nichols*, 56 F.3d 403, 417 (2d. Cir. 1995).

It is true that a person in custody, as can any person, choose to be voluntarily absent. RCr 8.28(1) contemplates such a situation. But I posit that much more is required to find a voluntary waiver of one's presence than what occurred here. Sloss was available and in the custody and control of the

60

authorities. However, the record does not clearly reflect that he was advised of his right to be present, nor that he personally waived that right. Thus, a knowing, voluntary, and intelligent waiver of this fundamental right is not evident from this record.

Certainly, the trial court was placed in a difficult situation, one it acknowledged it had never before encountered. Yet, even recognizing the requirements of the rule to conduct a hearing and make a finding, the trial court did not do so. Contrary to the majority's assertions, my review of the record reveals no hearing occurred and no finding consistent with RCr 8.28(1) was made. Had the trial court received any direct statement from Sloss regarding waiver, or even made the simple finding required by RCr 8.28(1) that Sloss was intentionally refusing to appear and nothing "short of physical force" could compel his attendance, perhaps my view of this case would be different. But unfortunately, that is not the record before the Court. In my view, more needed to be done to pass constitutional muster, and certainly more than the double inference relied upon by the majority.

For the foregoing reasons, I must respectfully dissent. I fear the majority's decision today erodes the Confrontation Clause and opens the door to potential mischief. And because I believe trial in absentia was a fundamental reversible error, I would reverse and remand for a new trial without reaching the merits of any of Sloss's other claims.

VanMeter, C.J., and Keller, J. join.

COUNSEL FOR APPELLANT:

Kathleen K. Schmidt
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Shawn D. Chapman
Deputy Solicitor General

Sarah N. Christensen
Assistant Attorney General